TOMÁS BRITO VIZCARRONDO, Plaintiff and Appellant, *v.* FLORENTINO LÓPEZ PÉREZ, Defendant and Appellee.

No. 7132. Argued February 6, 1936.—Decided May 29, 1936.

*Angel A. Vázquez* for appellant. *Damián Monserrat, Jr.* and *J. M. Calderón, Jr.*, for appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the Court.

This is a homestead case which was decided against the plaintiff. Plaintiff averred in his complaint that on November 29, 1926, he had his home established in a certain house belonging to him in Santurce, that he mortgaged it to the defendant, and that upon failure to pay his debt, the defendant sought to collect it by summary foreclosure, the house being adjudged to him in May, 1934, at which time the plaintiff and his family were ejected by order of the court. He claims $500 for his homestead.

Defendant denied in his answer that plaintiff was the head of a family and that he was living as such in the house in

question at the time he mortgaged it, or at the time when he was ejected therefrom. As a matter of special defense, he further avers that the complaint does not set forth facts sufficient to constitute a cause of action; that on the date of the constitution of the mortgage so foreclosed, plaintiff did not live on the mortgaged property; that at the time it was awarded to him, the property was subject to a tax claim amounting to $71.25, an amount which ought to be deducted from the amount of the claim, and that the mortgaged house was destroyed by the hurricane of 1932, defendant having been left in possession of the lot only.

The case went to trial, and the court on January 31, 1935, decided it in favor of the defendant, for the reasons set forth in its statement of the case and opinion, as follows:

"There is a conflict in the evidence, a conflict which in our opinion is irreconcilable, but from the analysis of the evidence as a whole and upon consideration of the fact that the house so mortgaged was erected in part upon the lot which plaintiff says belonged to his sister, the evidence offered by the defendant seems to us more worthy of credit, and this being so, we must necessarily reach the conclusion that at the time the mortgage lien was constituted, there was no homestead right, it being immaterial that subsequent to the constitution of the mortgage the plaintiff might have moved his residence to the mortgaged property."

Plaintiff appealed. His single assignment of error is as follows:

"The court exceeded the use of its discretion in deciding against the plaintiff the slight conflict between the evidence of the plaintiff and that of the defendant, and rendered, as a consequence, a judgment which violates the fifth paragraph of Section 162 of the Law of Evidence."

The documentary evidence is not contradictory. The oral evidence upon the point mentioned by the trial court is contradictory.

The plaintiff, Frank Laborda and Agustín Rivera, testified in support of plaintiffs' allegations.

The former testified:

"I am the head of a family and I have a family who depend on me; I am a master builder, with more than 40 years of experience, and in the year 1906, when I was the owner of the lot described in the complaint in this suit, I constructed thereon, personally and expressly that I might live there with my family, the two-story house which together with the lot I mortgaged in 1926 to Florentino López Pérez; when I constituted that mortgage I was living in that house; that was in Calle Solá in Santurce, and when I finished the house in 1906, I moved in at once to live there with my family, on the second floor, and I used to rent the lower floor for business purposes, which brought me in the sum of $40 a month; when I moved in with my family on the upper floor of that house, my family consisted of my wife, Luisa Ritz, my daughter Rafaela Brito, my mother-in-law, Constancia Santel, my step-daughter Antonia Ritz, my god-son Narciso Beltrán, my god-daughter Ignacia Remigio, my niece Lidia Figueroa, and my grand-daughter Carmen María Valladares, all of whom I maintained and supported and who depended upon me; that after I moved into this house in 1932, I did not move elsewhere, until in 1932 I had to abandon it for some time; taking refuge in the house next door, belonging to my sister, which I managed and which was in my name, since the San Ciprián hurricane knocked down my house and left it askew, and I put it back in place as well as I could and moved back with my family and repaired it; it was then a house of only one floor with three livable rooms, toilet facilities, water, and the dining room was used as the kitchen, and they were all living there with me while I supported them, until I was thrown out of the house by the marshal of this court in July of 1934; at the present time the house as it is with one floor, together with the lot, is worth about $1,500; when I made that mortgage in 1926, the house was worth $4,000, I had no other property . . .".

Laborda testified:

"I am a master builder with ten years, more or less, of experience; . . .

"The house and lot involved in this suit are in Santurce, Calle Solá and are worth at the present time about $1,000 to $1,500; I have known the plaintiff Tomás Brito for 30 years; he is also a master builder, and in the year 1906 he built the house in question for himself to live in with his family, and once it was finished he moved there with his family; it was a two story house, Brito moved into

the upper floor with his family and rented the lower floor for business purposes; I lived very near to Tomás Brito in 1916, at which time he was still living in the upper floor of the house with his family, and although I later moved to another part of Santurce, I passed by Brito's house quite frequently and saw him living there constantly until 1932 when the house was knocked down by the San Ciprián hurricane; I then told him that it could be raised and repaired because it was in good condition, and we hauled the house into position, and Brito moved to the house next door while his was being repaired; Brito's house was left as a one-story house of the same dimensions as before, and as soon as the repairs were finished he moved back again with his family because he has not lived in any other house and has been living there constantly until he was thrown out of the house with his family by the marshal in July of 1934; in the year 1926 Tomás Brito lived with his family on the upper floor of that house, because I saw him personally; Brito continued to be head of his family and supported them all; the house as it was left after the hurricane was not habitable."

Rivera also testified:

"I am a master builder with some 14 years of experience, and my last job was a concrete building behind Clínica Miramar which it worth more than $7,000; . . . I know Tomás Brito, the plaintiff, who is also a master builder and who in 1906 built on Calle Solá, in Santurce, the house involved in this suit, for himself and his family to live in; at this time and when he was thrown out, that house would be worth about $1,200 a $1,300; when Brito finished the building of that house in 1906, it was a two story house and he at once moved into the upper story with his family; the family which Brito had at the time he moved in, consisted of his wife and his children; Brito was the head of that family and supported all of them; Brito was living with his family on the upper floor of the house until 1932; the hurricane destroyed the lower floor and knocked the upper floor out of place; I helped Brito put the house back in its place, because it fell a little bit out of place when the hurricane . . .; it was then left with only one story, and he lived right there with his family; in the year 1926 Brito lived with his family on the upper floor of the house, and I know this because I used to go to the house frequently; Brito never moved from his house from 1906 until the hurricane in 1932; in the year 1926 I was living in Santurce, in Mr. Brito's house, of whom I am a relative and upon whom I depended for my support."

The defendant testified on his own behalf, along with Francisco Berga, José Lázaro Costa, and the marshal, Molina.

The defendant said:

"I know the plaintiff with whom I entered into a contract of mortgage on the property involved in this suit, in the month of November, 1926, for the sum of $2,000; some time before carrying on the business of the mortgage I went to see the house together with Francisco Berga to see whether it would guarantee the amount which Brito wanted on mortgage, and it was a two-story house, the upper floor used for living purposes, and the lower for business, which was then rented to several tenants, and the upper floor was also rented, and Brito told me that it was leased for about $40 monthly; . . . . when I made the mortgage Brito did not live in that house, but in one which belonged to him, adjoining this one; when I executed the mortgage the house had two stories, it was well preserved and now there are remains of on story, which are not in a habitable condition; I entered into possession of that property about the middle of July of this year, and it was then in the same condition in which it is today, that is, some remains which would have to be cleared away and a new building constructed, because the foundations which were constructed on the property, were on the adjoining lot which belonged to Mr. Brito and must be destroyed; the remains of the house when they were delivered to me in July had no sanitary installations or running water; one of the floors of the house, the upper floor, all tumbled down, crooked and placed upon the foundation of the house when it had two stories; some doors and windows were missing; it had others, however, boarded up, particularly those looking out on to the street."

Berga testified:

"I am a manager of city properties, I have known Florentino López Pérez for about 11 years and I knew him in 1926; I know Tomás Brito by sight and I remenber that about the first few days in September Mr. López called me and told me that he was thinking about executing a mortgage with Brito and that he wanted me to go with him to see the property, as a person familiar with that busines . . . . and he took me to Calle Solá in Tras Talleres number 6, and we looked at it; it was occupied by tenants. And he said to me 'I am going to execute a mortgage, and I want you to give me

your opinion' and I saw the house and I saw that with the tenants living there, it would more than guarantee the mortgage, and I said to him: 'It is my opinion that you can do it.' And later I met him on the street and asked him if he had gone into the business, and he told me: 'Yes, I did it'; the house which I saw was on Calle Solá, number 6, a wooden house, of one floor, and it had another floor upon part of the rear, and I did not see Brito living there, I saw tenants in the whole house; I believed that Brito lived next door in a little concrete house which is still there; now recently, in the month of July of this year, Mr. López sent me there to see the shape in which the house was to determine whether it could be reconstructed, and I went and saw the condition it was in, because it is in a condition in which it cannot be lived in, because it is in ruins; I was present when the marshal delivered the property to Mr. López; and the house which the marshal delivered was not the same as that I saw in '26 when the mortgage was made, because it was uninhabitable, destroyed, without doors, that in the condition in which it was in, it could not have been lived in, because it was threatening to fall down; nobody was living there, there was no one; I did not see Brito living in that house when I went there for the first time I said that tenants were living there, and I believed that he was living next door.''

The judge asked the witness: ''But you are not sure that he was living there?'' And the witness answered: ''I saw his family there and I suppose that he was living there, and I saw him come out of that house; when I went with the marshal there was nobody living there.''

Lázaro Costa testified:

''I have been a civil engineer for 35 years; Florentino López Pérez asked me to make a valuation of a property on Solá Street in Santurce, and I made the appraisal about five days ago; I found a wooden house that was wrenched from its foundations; there was a concrete foundation, and upon that foundation there was a partly roofed wooden house; there were two sheets of zinc completely torn away; it had no porch; the house had posts for a porch, but it had no porch; part of the roof of the porch was also torn away; inside, the inside partitions were out of place; the inside doors were down; the floor moved when stepped in strongly and the inside partitions moved also. There was no sanitary installation that worked; there

was a toilet; it had no box or ventilation; the pipes were broken. There are some remnants of a lighting system or electric light and some switches; those switches are connected with the wall; the house has no water; if the house should be reconstructed it would not comply with the laws in force in Puerto Rico for the construction of houses, and furthermore the cordboard was full of termites, so that it was in very bad shape, so that I valued the usable material in that house at about $150 aside from what the lot was worth."

The deputy marshal testified:

"I was the officer who served the writ; I went to see Mr. Brito two or three times to notify him that that property had been foreclosed and that he had to move; I gave him a time limit, and I came back there and he told me that he would not move; about that time the thirty days which I had in the original writ expired; the party got a new writ, and I went back to notify him and told him: 'All right, the time is up and you have not moved, I'll move you myself,' and he told me: 'You'll have to kill me, marshal, because I'm not moving;' people couldn't live there; the house is in complete ruins; there was something of a kitchen, a bed and the rest was missing; it is a two-story house which fell down, in the rear it had no doors; it really wasn't fit to live in; it was completely ruined; the day I was there to deliver the property to the plaintiff, it was the same, there had been no repairs nor had anything been done."

Upon being recalled to the stand, the plaintiff said:

"The part of that house leased for $40 was the lower floor, I lived on the upper floor; on the lower floor there were shops and tenants and I never had tenants on the upper floor; when I executed the mortgage, I had not at any time moved from that house."

This Court has repeatedly held that when a conflict of evidence has been decided by the trial court, its decision will prevail unless it is shown that it acted under the influence of bias, prejudice or partiality, or that it committed manifest error.

Here it is not contended that there was passion, prejudice or partiality. It is maintained, however, that there was manifest error, and in support thereof appellant has cited

Section 524 of the Code of Civil Procedure, Section 162 of the law of evidence, which reads in part as follows:

"In civil cases the affirmative of the issue must be proved, and when the evidence is contradictory, the decision must be made according to the preponderance of proof."

He has also cited Section 227 of the same Code, as amended in 1925, which states:

"Sec. 227. At the final hearing of any case in a district court, the judge thereof shall render and file at the time of the sentence, a written opinion which shall be attached thereto, wherein he shall state separately and briefly the facts he considers proved and his juridic reasons for his decision. When the findings of fact are based on conflicting evidence the judge shall state the reasons he may have had for deciding the conflict as he did; and, in case of appeal, the Supreme Court shall weigh said evidence and determine if the findings were warranted or not."

The fundamental point for decision is whether the plaintiff did or did not live with his family in the house when he mortgaged it to the defendant. If he lived there, his claim for homestead will lie. If he did not live there, it has no foundation.

The evidence introduced has been brought before this Court by a statement of the case prepared in accordance with the law. We have copied it almost entirely. We have omitted only repetitions and some statements of the witnesses which we have deemed to be unimportant. After a conscientious study of the evidence, we find ourselves bound to hold that the court, in weighing it, committed the manifest error assigned by the appellant.

Upon plaintiff's side we find his own testimony and that of the builders Laborda and Rivera clear, complete and persuasive. Opposed to that upon the point in controversy we have the testimony of the witness Berga and the defendant. The defendant insists that when he made the mortgage, "Brito did not live in that house but in one which belonged to him, adjoining this one." Berga confined himself to stat-

ing that when he went with the plaintiff to inspect the house to determine whether it was worth sufficient to guarantee the loan which was being negotiated, he saw tenants in the whole house and thought that Brito lived next door in a concrete house which is still there. And when the judge insisted and at the end of his testimony asked him if he was sure, he again answered: "I saw his family there and I suppose that he was living there and I saw him come out of that house." He states nothing with assurance, leaving only one witness, the plaintiff, who makes a positive statement, made, however, by a person who certainly did not know the plaintiff's family, and who was only interested in whether the house really belonged to him and was sufficiently rented. The circumstance as to whether or not the plaintiff was living there with his family upon the upper floor of the house was not something which would necessarily have been called to his attention at that time, since he is not shown to be a person who was versed in the technicalities of the law.

In our opinion defendant's evidence is not sufficiently strong to overcome that of the plaintiff, which we have already characterized as clear, complete and persuasive. The preponderance of evidence is in his favor and consequently the conflict must be decided against the defendant.

We have very little to add. Every householder, having a family, shall be entitled to an estate of homestead to the extent and value of $500 in a farm, plantation or lot of land, and buildings thereon owned by him, according to the special statute upon the subject approved March 12, 1903 (Comp. of 1911, No. 1000). Here the plaintiff was the owner of a lot, constructed thereon a two-story house and lived there on the upper floor with a large family which depended on him, and rented the lower floor. In need of money, he borrowed from the defendant upon the security of the house and lot. Then the 1932 hurricane destroyed the house and he took refuge with his family in his sister's house which was next door. With the aid of his friends he repaired as best he

could his old home, which was left with a one story house, and returned there with his family as soon as it was in livable condition. He did not pay the debt which he had undertaken. The creditor foreclosed the mortgage and the house and lot were awarded to him in partial payment of his claim, and the plaintiff was ejected by legal action from the property in which he had his homestead.

Broadly speaking, these are the facts which appear from the pleadings and the evidence. The house and lot were worth according to plaintiff's evidence $1,000 to $1,500 at the time of foreclosure. Defendant's expert limited himself to saying that the usable materials in the house were worth $150, "aside from what the lot was worth."

Up to the sum of $500, according to the statute to which we have referred, plaintiff's homestead was "exempt from attachment, judgment, exaction or execution." He was ejected therefrom by an action of the creditor and the latter put into possession. He has therefore according to the facts and the law, a right to require the defendant to pay him the $500 which he claims.

The appeal must be sustained, and the judgment appealed from reversed and substituted by another adjudging the defendant to pay to the plaintiff $500, without costs.

Mr. Justice Wolf dissented.

Mr. Justice Córdova Dávila and Mr. Justice Travieso took no part in the decision of this case.